CITY OF PHILADELPHIA, on behalf of itself and all other public bodies and ultimate consumers in the States of Pennsylvania, New Jersey and Delaware, similarly situated, Plaintiff,

v.

The AMERICAN OIL COMPANY et al., Defendants.

STATE OF NEW JERSEY, on behalf of itself and all other public bodies and ultimate consumers in the State of New Jersey, similarly situated, Plaintiff,

v.

The AMERICAN OIL COMPANY et al., Defendants.

McCLOSKEY AND COMPANY, on behalf of itself and all others similarly situated, Plaintiff,

v.

The AMERICAN OIL COMPANY et al., Defendants.

YELLOW CAB COMPANY OF PHILADELPHIA et al., Plaintiffs,

v.

The AMERICAN OIL COMPANY et al., Defendants.

Civ. A. Nos. 647–68, 90–69, 47–70 and 98–70.

United States District Court, D. New Jersey.

July 13, 1971.

Joseph B. Kauffman, Atlantic City, N. J., for City of Philadelphia (Harold E. Kohn and Dolores Korman, Philadelphia, Pa., of counsel).

George F. Kugler, Jr., Atty. Gen., Trenton, N. J., for State of New Jersey (Perry Goldberg, Chicago, Ill., of counsel).

Kronisch & Felzenberg, Newark, N. J., for McCloskey and Co. (Seymour Kurland and Judah I. Labovitz, Philadelphia, Pa., of counsel).

James A. McTague, Jr., Jersey City, N. J., for Yellow Cab Co. of Philadelphia, Yellow Cab Co. of Camden, and Yellow Limousine Service, Inc. (David Blasband, New York City, and Ronald Litowitz, Trenton, N. J., of counsel).

Stickel, Kain & Stickel, Newark, N. J., for American Oil Co. (M. J. Keating and Fred Bartlit, Chicago, Ill., of counsel).

McCarter & English, Newark, N. J., for Atlantic Richfield Co. (Robert J. Sisk, New York City, and Bancroft Littlefield, Providence, R. I., of counsel).

Schumann, Hession, Kennelly & Dorment, Jersey City, N. J., for Chevron Oil Co. (Allen F. Maulsby and Edmund G. Glass, New York City, of counsel).

Milton, Keane & DeBona, Jersey City, N. J., for Cities Service Co. and Cities Service Oil Co. (Simon H. Rifkind, Jay

Greenfield and Monty Davis, New York City, of counsel).

Lowenstein, Sandler, Brochin, Kohl & Fischer, Newark, N. J., for Getty Oil Co. (C. J. Head, New York City, of counsel).

Robert Carey, Jr., Newark, N. J., for Gulf Oil Corp. (Leo T. Kissam and Frederick L. Scofield, New York City, of counsel).

Stryker, Tams & Dill, Newark, N. J., for Humble Oil & Refining Co. (William Simon, Washington, D. C., Michael Graney, New York City, John H. Chiles, Waco, Tex., and Robert Bass, Jr., of counsel).

Riker, Danzig, Scherer & Brown, Newark, N. J., for Mobil Oil Corp. (John E. F. Wood and G. F. Rice, New York City, of counsel).

Pitney, Hardin & Kipp, Newark, N. J., for Sinclair Refining Co. (Robert J. Sisk, New York City, and Bancroft Littlefield, Providence, R. I., of counsel).

Toner, Vanderbilt & Toner, Livingston, N. J., for Sun Oil Co. (J. B. H. Carter and Alfred W. Cortese, Jr., Philadelphia, Pa., of counsel).

Carpenter, Bennett & Morrissey, Newark, N. J., for Texaco, Inc. (Milton Handler, Michael Malina, New York City, and William R. Slye, Houston, Tex., of counsel).

## OPINION

AUGELLI, Chief Judge:

Three overlapping classes have been presented in these price-fixing antitrust actions for certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. The guidelines established in Pretrial Order Number One and its subsequent amendments for the filing of briefs and affidavits have been complied with by all parties. Extensive and able oral argument has been presented on the issues involved in class certification.

## I. HISTORY OF THE CONSUMER ACTIONS AND CLASS CERTIFICATION QUESTIONS.

These cases (hereinafter referred to as "consumer actions"), brought pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), have their genesis in a criminal indictment filed in Newark on April 8, 1965 (Criminal Docket No. 153–65). In Count I of said indictment, the Grand Jury charged The American Oil Company, The Atlantic Refining Company, Cities Service Company, Cities Service Oil Company, Gulf Oil Corporation, Humble Oil & Refining Company, Sinclair Refining Company, and Socony Mobil Oil Company, Inc., with violations of Section 1 of the Sherman Act (15 U.S.C. § 1). Also named as co-conspirators, but not defendants in Count I were the California Oil Company, Sun Oil Company, Texaco, Inc., and Tidewater Oil Company. Specifically, Count I charged all the defendants and co-conspirators with unlawfully combining and conspiring to:

(a) raise, fix, stabilize and maintain tank wagon prices and retail prices of gasoline in the trading area, and

(b) substantially restrict the amount of gasoline available to distributors and dealers engaged in the sale of private brand gasoline in the trading area. The trading area was defined as the states of Delaware, New Jersey and Pennsylvania. This alleged conspiracy began in 1955 and continued until at least the filing of the indictment in April, 1965.

The Grand Jury charged that because of the defendants' activity, the following unlawful results occurred:

(a) tank wagon prices of gasoline in the trading area were raised, fixed, stabilized and maintained;

(b) retail prices of gasoline in the trading area were raised, fixed, stabilized and maintained;

(c) price competition between dealers in the trading area had been suppressed;

(d) competition from distributors and dealers engaged in the sale of private brand gasoline in the trading area had been restrained and suppressed;

(e) distributors, dealers and the public in the trading area were denied the opportunity of purchasing gasoline in a free and competitive market.

Count II of the indictment charged defendants The Atlantic Refining Company, Cities Service Company, Cities Service Oil Company and Gulf Oil Corporation with an unlawful combination and conspiracy to monopolize in violation of Section 2 of the Sherman Act (15 U.S.C. § 2). Similarly, Count III of the indictment charged the same four defendants with an unlawful attempt to monopolize in violation of said Section 2 of the Sherman Act. On the eve of trial on the indictment, defendants pleaded nolo contendere. These pleas were accepted ·in 1969. Fines were imposed on some of the defendants on December 12, 1969 and on the remaining defendants on December 23, 1969.

The first of the consumer actions now pending before this Court began with the filing of a complaint on November 7, 1967, by the City of Philadelphia in the Eastern District of Pennsylvania as a class action on behalf of "all state and municipal governments, governmental agencies, authorities, commissions and subdivisions situated throughout the States of Pennsylvania, New Jersey and Delaware", which purchased gasoline and were injured by the defendants' three state price-fixing conspiracy. The defendants listed in the complaint included the eight defendants in the criminal action plus the four named co-conspirators. That action was transferred to this District by order dated May 20, 1968.

The State of New Jersey filed its action on January 23, 1969, on behalf of "all governmental purchasers" of gasoline in New Jersey. The complaint was amended, pursuant to leave of Court, on April 17, 1969, to allege also a class action on behalf "of all consumers" of gasoline in New Jersey. In addition the State of New Jersey sued "in its capacity as *parens patriae*, and/or protector, and/or trustee, and/or guardian on behalf of all the people of the State of New Jersey." (That "parens patriae" is no longer in suit.)

On March 2, 1970, the City of Philadelphia and New Jersey, pursuant to leave granted by this Court, filed a Consolidated and Amended Complaint. The consolidated action is brought on behalf of "all state and municipal governments, governmental agencies, authorities, commissions and subdivisions and all other ultimate consumers situated throughout the States of Pennsylvania, New Jersey and Delaware which have purchased, directly or indirectly, for use and not for resale", gasoline from one or more of the defendants during the period 1955 through April 1965, and sustained damages as a result of the violations of the antitrust laws. Intervention has been permitted in this consolidated action. These intervenor plaintiffs represent a cross-section of industrial and business concerns. They used a full spectrum of available methods to purchase gasoline within the trading area during the period in suit. The plaintiffs in the Philadelphia-New Jersey consolidated action will hereinafter be referred to as "Philadelphia-New Jersey."

The next action, by McCloskey and Company (McCloskey), was filed on October 28, 1969 in the Eastern District of Pennsylvania against the same defendants named in the Philadelphia-New Jersey action. This complaint was amended on January 30, 1970. By its amended complaint, McCloskey seeks to represent a class consisting

"of all individuals, partnerships, corporations and other entities (but excluding all state and municipal governments, governmental agencies, authorities, commissions and subdivisions), situated throughout the states

of Pennsylvania, New Jersey and Delaware, who have purchased from one or more of the defendants, in tank wagon quantities and/or at tank wagon prices, for their own consumption and not for resale, the products described in the period of suit and who have sustained damages thereby * * *."

The period in suit is again between 1955 and April 1965. McCloskey is a large construction corporation which uses considerable quantities of automotive gasoline in its daily operations. Partnerships and corporations who purchased gasoline in tank wagon quantities in the geographic area defined in the complaint during the period in suit have filed intervenor complaints in the McCloskey action. Said action was transferred to this Court by order dated December 18, 1969.

The remaining consumer action is brought by the Yellow Cab plaintiffs against the same defendants named in the other actions. Their action was commenced on December 29, 1969 in the Eastern District of Pennsylvania and transferred to this Court on January 19, 1970. The Yellow Cab plaintiffs (Yellow Cab) consist of the Yellow Cab Company of Philadelphia, Yellow Cab Company of Camden and Yellow Limousine Service, Inc. They operate approximately 1600 taxicabs, limousines and "cabulances" in the Philadelphia and Camden areas. The vehicles operated by the Yellow Cab plaintiffs constitute approximately 23% of the aggregate of all taxicabs operating in the three state area. Gasoline is a significant item of expense for them. The class alleged in the Yellow Cab complaint, the relevant time again being 1955 through April 1965, consists

"of all individuals, partnerships, corporations and other entities engaged in the business of furnishing taxicab, limousine and related services (but excluding all state and municipal gov-

ernments, governmental agencies, authorities, commissions and subdivisions), situated throughout the states of Pennsylvania, New Jersey and Delaware, who have purchased gasoline * * * from one or more of the defendants, for their own consumption and not for resale, in the period of suit and who have sustained damages thereby as a result of the conspiracy * * * alleged."

Each of the complaints in these consumer actions tracks the original indictment. There are three counts to each complaint, the first count alleging a violation by all twelve defendants of Section 1 of the Sherman Act (15 U.S.C. § 1). Contained within that count is a paragraph alleging fraudulent concealment of the combination and conspiracy. The second count alleges that The Atlantic Refining Company, Cities Service Company, Cities Service Oil Company and Gulf Oil Corporation unlawfully engaged in a combination and conspiracy to monopolize in violation of Section 2 of the Sherman Act (15 U.S.C. § 2). The same four defendants are alleged in count three to have attempted to monopolize for the purpose of raising, fixing, stabilizing and maintaining tank wagon prices and retail prices of gasoline in Delaware, New Jersey and Pennsylvania between 1955 and April 1965 in violation of Section 2 of the Sherman Act (15 U.S.C. § 2). Plaintiffs in each of the three actions predicate recovery under the treble damage provisions of the Clayton Act (15 U.S.C. § 15). In addition, each of the counts in each complaint requests injunctions to prohibit the continuance of the alleged violations of the antitrust laws.

The question presently before the Court is whether any or all of the three purported classes can be maintained in these consumer actions. The resolution of this difficult and complex question requires an analysis of Rule 23 of the Federal Rules of Civil Procedure and the

rapidly developing case law under that Rule.

## II. THE CLASS ACTION RULE— FEDERAL RULE OF CIVIL PROCEDURE 23.

The plaintiffs in each of these three consumer actions are attempting to maintain their respective class actions under the provisions of Rule 23. In pertinent part this Rule provides:

(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) *Class Action Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encoun-

tered in the management of a class action.

(c) *Determination by Order Whether Class Action to be Maintained; Notice; Judgment; Actions Conducted Partially as Class Actions.*

\* \* \* \* \* \*

(2) In any class action maintained under subdivision (b) (3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

Rule 23 was amended significantly in 1966 to take its present form. Previous to the 1966 amendments, the Class Action Rule had divided class actions into three categories which were commonly known as "true", "hybrid" and "spurious." The latter category, which would have encompassed the present actions if the pre-1966 Rule was still applicable, made an all encompassing consumer action almost impossible since one had to affirmatively assert his membership in a class to be bound by the judgment. Thus, an adjudication of a "spurious" class action was res judicata only upon those present before the court. New subdivision (b) (3) of Rule 23, which is the only basis for the claims of class status by all plaintiffs before the Court, provides a much broader and more encompassing class action concept than the old Rule 23 "spurious" action. If the requirements set forth in amended Rule 23(a) and (b) (3) are met, then all persons who are described by the class are bound by the decision of the

court unless they affirmatively ask to be excluded.

"The object is to get at the cases where a class action promises important advantages of economy of effort and uniformity of result without undue dilution of procedural safeguards for members of the class or for the opposing party. The new provision invites a close look at the case before it is accepted as a class action and even then requires that it be specially treated." Kaplan, "Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure", 81 Harvard Law Review 356, at 390 (1967).

For a more detailed review of the purposes of the 1966 amendments to Rule 23 and an analysis of underlying problems, see: Advisory Committee's Notes, 39 F.R.D. 69, 95, and Judge Marvin E. Frankel, "Some Preliminary Observations Concerning Civil Rule 23", 43 F. R.D. 39 (1967).

Because absent class members will be bound by this Court's decision unless they take affirmative steps to be excluded from the class, the Court must carefully decide whether the requirements set forth in Rule 23(a) and (b) (3) are met. In reaching this decision, the experience other courts have had with respect to (b) (3) class actions under Rule 23 is helpful. Precedent is abundant in the areas of securities fraud cases and price-fixing antitrust actions. These developments will be analyzed after the positions of each of the plaintiffs and the defendants are examined.

## III. ARGUMENTS FOR CLASS MAINTENANCE MADE BY YELLOW CAB.

The Yellow Cab plaintiffs, as previously outlined, are attempting to maintain a class consisting of all entities engaged in the business of furnishing taxicab, limousine and related services in the three state trading area. Contained within the Yellow Cab class are business operations ranging from a single vehicle to a whole fleet of taxicabs. Gasoline is a major expense item for all concerned. Members of the class purchase gasoline in many different ways. The larger operators purchase in tank wagon quantities while smaller members purchase from retail stations. The Yellow Cab plaintiffs, who constitute approximately 23% of that entire class, claim to have spent over $8,500,000.00 for gasoline between 1955 and 1967. Claiming to be "the most natural class" of the three classes before this Court for certification, the Yellow Cab plaintiffs argue that each of the four prerequisites of Rule 23(a) are met.

(1) *The class is so numerous that joinder of all members is impracticable.*

The Yellow Cab plaintiffs point out that there are at least 550 taxicab operators in the three state area which makes it nearly impossible to join all the class members in this action. Defendants do not contest this point.

(2) *There are questions of law and fact common to the class.*

The argument presented by Yellow Cab on this prerequisite is very similar to the arguments presented by McCloskey and Philadelphia-New Jersey. Each of the three sets of plaintiffs basically say that they will prove (a) that there was a conspiracy to fix the prices of gasoline in violation of the antitrust laws; (b) that the prices of gasoline were fixed pursuant to such conspiracy; and (c) that as a result the respective plaintiffs and their respective class members purchased gasoline at prices which were higher than they would have been in the absence of such a conspiracy. The issue of whether or not such a conspiracy existed is a common question of law and fact. Defendants do not disagree as to this. However, with respect to the impact of the alleged conspiracy upon the prices paid for gasoline by class members, defendants do strenuously argue that this question is not com-

mon, contrary to plaintiffs' respective positions. This argument will be more fully explored later in this opinion. Its prime significance, however, relates to the specific requirements under (b) (3) of Rule 23 rather than the prerequisites for all class actions under Rule 23(a).

### (3) *The claims of plaintiffs are typical of the claims of the class.*

The Yellow Cab plaintiffs allege that they and all other members of their purported class paid an inflated price for gasoline during the applicable period because of defendants' conspiracy to fix gasoline prices, no matter how good a deal each class member may have gotten comparatively, and no matter how the gasoline was purchased. Therefore, it is argued that the claims of the Yellow Cab plaintiffs are typical of the claims of the class. Similar arguments are made by McCloskey and Philadelphia-New Jersey with respect to the classes they seek to maintain. Defendants, as will be noted later, point out that the Yellow Cab plaintiffs purchased gasoline by tank wagon quantities at negotiated prices. No gasoline was purchased from retail stations. Because of this, defendants conclude that the claims of the Yellow Cab plaintiffs can not be typical of those class members who purchased gasoline in a totally different manner, i. e., from retail stations at a much higher price.

### (4) *Plaintiffs will fairly and adequately protect the interests of the class.*

The Yellow Cab plaintiffs point out that their claims constitute one of the largest claims of any entity in the consumer class actions pending before this Court. This in itself, it is argued, will insure that the Yellow Cab plaintiffs will vigorously prosecute the class action and obtain the best results possible. In addition, they are represented by counsel experienced in antitrust litigation, having done both plaintiffs' and defendants' work in class actions. Defendants do not challenge the qualifications of counsel for Yellow Cab, nor do they argue, except for the assertion that the claims of the Yellow Cab plaintiffs are not typical of the claims of the other members of the class, that plaintiffs will not fairly and adequately protect the interest of the class.

With respect to the specific requirements for a Rule 23(b) (3) class action, only two criteria are placed in issue by defendants with respect to all of the pending consumer actions. Defendants, as will be analyzed later, argue that (1) the questions of law or fact common to the members of the class do not predominate over any questions affecting individual members, and (2) the problems of managing these class actions are so immense that they are not superior to other available methods for a fair and efficient adjudication of the controversy. Because defendants do not contest the other specific, but non-exhaustive factors, this Court, in determining whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy, will consider only the arguments made by each of the three sets of plaintiffs with respect to predominance and manageability. A determination of these two requirements will be dispositive of whether any or all of the purported classes should be certified.

Yellow Cab argues that the requirement of predominance of common questions over individual questions is met by again pointing to the common questions of conspiracy, price-fixing and inflated prices affecting all members of the class. They separate these questions from those of damages, recognizing the latter to contain many individual questions concerning damages to each class member. The Yellow Cab plaintiffs believe, however, that this can be done without destroying the predominance requirement of a Rule 23(b) (3) action. Defendants vigorously argue to the contrary.

With respect to manageability, the Yellow Cab plaintiffs believe that their purported class can be properly managed. They also say that the cost of notice as required by Rule 23(c) (2) for a Rule 23(b) (3) class action is not overwhelming; that public records are available to ascertain the entire membership of the class; and that since the total number of possible class members will be below 1,000, the handling of individual claims can be readily accomplished. Defendants, while not arguing that the sheer size of the taxicab class makes it unmanageable, do argue that the different methods used to purchase gasoline by taxicab class members make the class unmanageable. This argument will be discussed later.

The Yellow Cab plaintiffs thus believe that they meet all the requirements of Rule 23(a) and (b) (3) and that their class should be upheld. It should be noted, however, that if this class and the other two purported classes are upheld, there will be a certain amount of overlap and conflict. The Philadelphia-New Jersey class will include both other classes since it includes practically all ultimate users of gasoline. The purported McCloskey class will overlap only with respect to taxicab class members who purchased gasoline in tank wagon quantities. Prior to oral argument McCloskey and Yellow Cab agreed to resolve any overlaps by including in the taxicab class and excluding from the McCloskey class any taxicab owners or operators who purchased in tank wagon quantities. A similar accord was not reached between Philadelphia-New Jersey and the Yellow Cab plaintiffs. At oral argument counsel for Philadelphia-New Jersey apparently acceded to the Yellow Cab plaintiffs' suggestion that all taxicab owners and operators be included within the Yellow Cab class and not the Philadelphia-New Jersey class unless any taxicab owner and operator, on notice, affirmatively decided to become a member of the Philadelphia-New Jersey class. Thus, taxicab owners and operators remaining silent would stay within the Yellow Cab class.

## IV. ARGUMENTS FOR CLASS MAINTENANCE MADE BY McCLOSKEY.

McCloskey believes that its action and purported class present a classic example of the use of Rule 23. As previously explained, all the members of the McCloskey class purchased in bulk quantities, variously referred to by defendants for pricing purposes as commercial tank wagon, consumer tank wagon, truck transport, and tank car, for their own use, not for resale, from defendants or from defendants' distributors. The class does not encompass purchases of automotive gasoline made at retail gas stations. Nor are any governmental bodies included therein.

Each of the requirements of Rule 23(a), McCloskey believes, are met by its purported class as follows:

(1) *The class is so numerous that joinder of all members is impracticable.*

As a matter of business policy, the defendants sold automotive gasoline in bulk to any consumer who had sufficient storage capacity and good credit. This fact makes it difficult to ascertain the exact size and membership of the McCloskey class. However, the parties to this consumer action seem to agree that 10,000 members is a good estimate of size. Defendants do not contest the impracticability of joining all these members in one action.

(2) *There are questions of law and fact common to the class.*

McCloskey presents arguments similar to those of the other plaintiffs concerning this point. Mainly emphasized is the alleged underlying conspiratorial agreement. In addition, McCloskey believes that the defendants are not in a position to seriously argue that there are no questions of law or fact common to the members of the class when in the

past the defendants have argued for consolidated discovery and continuously pointed out the enormous areas of overlap between these cases and the D'Ippolito cases.[1]

**(3) *The claims of plaintiff are typical of the claims of the class.***

To support this requirement under Rule 23(a), McCloskey points to the many corporations which have intervened in its action as showing the typicality of its claims with reference to the class. McCloskey consumes gasoline in its own business, and the expense of that gasoline is a significant cost item in the operation of its business as is the case for a large segment of the purported class. Defendants, while asserting that the claims of Philadelphia-New Jersey and Yellow Cab are not typical of the claims of the class they seek to represent, do not strenuously argue that McCloskey's claims are not typical. However, defendants raise other arguments to contest the viability of the purported McCloskey class.

**(4) *Plaintiff will fairly and adequately protect the interests of the class.***

McCloskey believes that no one has questioned that its interests and those of the intervenors are identical to those of all the class members. This plaintiff is represented by experienced and able counsel who state that they will prosecute the case vigorously. Defendants do not challenge the McCloskey class on this point.

With respect to the predominance requirement of a Rule 23(b)(3) class action, McCloskey vigorously argues that common questions of law and fact predominate over any questions affecting only individual members. Arguments similar to those presented by Yellow Cab

and Philadelphia-New Jersey are made. Thus, McCloskey believes that the issue of conspiracy is common and the question of individual damages is separable if it cannot be commonly treated. Separating individual damage questions from the issue of conspiracy does not, McCloskey argues, destroy predominance of common issues over individual questions. McCloskey vigorously attacks defendants' contentions that because there were a number of price changes during the period the suit covers, that because some class members purchased directly from defendants while others dealt with distributors, and that because some class members bought on a bid basis and others on a negotiated basis, it follows that there are more differences than similarities within the class. This dispute will be fully discussed later.

McCloskey spent considerable time arguing that its class action is manageable. Although the exact membership of the class has not as yet been ascertained, McCloskey believes that if it is permitted access to certain business records kept by various defendants, it can compile a fairly exhaustive list of the members of the class. Thus, it would be possible to give direct mail notice to a significant portion of the class. Coupled with the argument that under 10,000 in number is not large enough per se to make the class inherently unmanageable, McCloskey believes its class meets the manageability criterion under Rule 23(b)(3). McCloskey's manageability argument is aided by the fact that most of the members of its purported class are business entities which would normally be expected to keep accurate records of gasoline purchases.

Much time was spent by McCloskey in its briefs to resolve the overlap and con-

1. Solve E. D'Ippolito, et al. v. Cities Service Company, et al. (Civil Action No. 779-68) and Solve E. D'Ippolito, et al. v. American Oil Company, et al. (Civil Action No. 780-68) are parallel cases presently before this Court. The same defendants are charged by distributors and dealers of gasoline with violations of the Sherman and Clayton Acts. Plaintiffs in the D'Ippolito cases allege a conspiracy by defendants to raise the prices of and restrict the quantity of gasoline available to them for the purpose of unlawfully forcing them out of business.

flict problems with the other two purported classes. As previously mentioned, prior to oral argument McCloskey and Yellow Cab had resolved any overlap problems between the two classes. This Court assumes that such agreement is still in full force. However, prior to oral argument there had been no agreement on resolving overlaps and conflicts with the Philadelphia-New Jersey class. During oral argument counsel for Philadelphia-New Jersey and McCloskey announced an agreement with respect to this particular problem which would make McCloskey a subclass within the Philadelphia-New Jersey class. The Court construes this agreement to mean that if the all-encompassing Philadelphia-New Jersey and the smaller McCloskey class are both certified, the McCloskey class will become a subclass of the Philadelphia-New Jersey class. Thus, non-certification or partial certification of one or more of these two classes will negate the agreement.

## V. ARGUMENTS FOR CLASS MAINTENANCE MADE BY PHILADELPHIA-NEW JERSEY.

The most difficult questions raised in sustaining any of the proposed classes are presented in the class which Philadelphia-New Jersey seek to have certified. This class is all-encompassing and would include both the Yellow Cab and McCloskey classes. All ultimate users of gasoline, whether governmental or non-governmental, in the three state area, who purchased gasoline through any wholesale or retail outlet for their own use are included in the proposed class. The magnitude of such class membership is readily apparent. Conservative estimates place the number of class members in the millions. The overwhelming majority of the class consists of retail users who purchased gasoline for their automobiles at branded and unbranded gasoline stations. Because of notice problems, Philadelphia-New Jersey refined class membership to include only those individuals who resided, or business entities which were in the three state area during the years between 1955 and 1965 and still have some connection with the trading area so that they will be able to receive adequate notice of this particular class action.

Before reviewing the arguments made by Philadelphia-New Jersey to support certification of their class, it would be helpful to analyze the purported class into its component parts. Two subdivisions are readily apparent. The Philadelphia-New Jersey class can be divided into governmental and non-governmental end users. Non-governmental users can further be refined into end users who purchased in tank wagon quantities and end users who did not. The former subdivision of non-governmental end users is the identical class McCloskey seeks to represent. The latter subdivision consists basically of the average automobile owner or operator who purchases his gasoline from a retail dealer. It is this category within the Philadelphia-New Jersey class which contains millions of potential class members. Extensive arguments are presented to show that said class meets the requirements of Rule 23(a):

(1) *The class is so numerous that joinder of all members is impracticable.*

It is clear that the joining of all the potential members of the Philadelphia-New Jersey class in this consumer action is impossible. Defendants do not contest the position of Philadelphia-New Jersey on this point.

(2) *There are questions of law and fact common to the class.*

Philadelphia-New Jersey rely, as do the other plaintiffs, on the establishment of the existence, scope and effect of the conspiracy alleged in these price-fixing antitrust suits to satisfy this second requirement. Philadelphia-New Jersey would have this Court separate the issues of the underlying conspiracy from the issues of individual damages.

Thus, the issue of underlying conspiracy would be common to all class members and satisfy this second requirement despite individual damage issues. The defendants' contrary view will be discussed later with respect to the issue of predominance of common issues over individual questions.

### (3) *The claims of plaintiffs are typical of the claims of the class.*

Philadelphia-New Jersey point out the broad spectrum of interests which are represented by them and the intervenors in their suit. Governmental and non-governmental entities from all over the three state area having purchased gasoline in every fashion possible and in a wide spectrum of quantities are represented. This, the plaintiffs believe, helps satisfy the requirement that the claims of the representative parties be typical. These plaintiffs further argue that this Court should read this requirement broadly to mean that the representative parties must not have interests which conflict with those they purport to represent. Despite all the different methods available to purchase gasoline, all class members are end users of the products involved. The same unlawful conduct, it is argued, has affected Philadelphia-New Jersey as well as all members of the class. All paid more for gasoline than they otherwise would have in the absence of the conspiracy, and all seek money damages. Hence, the claims of Philadelphia-New Jersey are typical of those of the other potential members of the purported class. Defendants challenge this position. Although their arguments will be fully spelled out later, briefly, they ask how can a government body such as the City of Philadelphia, which purchased gasoline by negotiation and bidding, claim to have typical claims when most of the class members purchased gasoline at retail from a service station and had little or no room to bargain over the prices they paid?

### (4) *Plaintiffs will fairly and adequately protect the interests of the class.*

On this requirement, Philadelphia-New Jersey point out that their interests are not antagonistic to other members of the class, that there is no collusion between them and the defendants, and that their counsel are able, competent, and experienced in this type of litigation. Defendants do not challenge plaintiffs on this point.

Turning to the specific requirements of a Rule 23(b) (3) action, Philadelphia-New Jersey argue that questions of law or fact common to the members of the class predominate over any questions affecting only individual members. Much time is spent attempting to refute defendants' contentions on this point. The main effort is centered on demonstrating how homogeneous the entire gasoline market is rather than how heterogeneous it is as depicted by the defendants. Once the alleged conspiracy is established, counsel for Philadelphia-New Jersey believe that they can readily show how this conspiracy affected price levels generally, thus eliminating the bulk of the problems surrounding the question of damages. Since this is a price-fixing conspiracy case, Philadelphia-New Jersey further argue that impact and damages are one and the same. If one can measure the extra amounts he had to pay for gasoline as a result of an unlawful conspiracy, he has measured both damages and impact at the same time. Defendants strenuously argue to the contrary.

The second requirement of a Rule 23(b) (3) action, that it be superior to other available methods for the fair and efficient adjudication of the controversy, Philadelphia-New Jersey argue, is likewise met. The alternative to a class action, plaintiffs say, is either the filing of separate actions on behalf of the persons injured by the conspiracy alleged or the use of the joinder rule and concomitant motions to intervene. They also

argue that even if only a fraction of the potential class members used either of these methods, it is apparent that a tremendous administrative burden on the Court would result, and that this would outweigh by far any similar burden caused by the maintenance of this Rule 23(b) (3) class. In addition, and most importantly, plaintiffs claim it would mean that the defendants would not be penalized for a large part of their unlawful conduct. The Philadelphia-New Jersey class contains millions of persons who have suffered damages from the alleged conspiracy but whose damages are not sufficient to justify the expenditure of large sums of money needed to prosecute an antitrust action. Thus, it is argued, the defendants would profit from the very magnitude of their alleged wrongful conduct.

With respect to the manageability of the proposed class, Philadelphia-New Jersey first confront the problems of notice this Court would have if the entire class is certified. Argument is presented with respect to the type of notice necessary and the ability of plaintiffs' counsel to handle this requirement with a minimum of supervision from the Court. At oral argument counsel for Philadelphia-New Jersey agreed to pay the cost of the notice they proposed. Since this Court is of the opinion that other factors will be dispositive of whether or not this proposed class is manageable, it will focus upon them rather than upon notice. Hence, the Court will not analyze the many problems involved with notice, and assume that the Rule 23(c) (2) requirements

can be satisfied without making the action unmanageable or adding to any management problems that may exist.[2]

Philadelphia-New Jersey also strenuously argue that their class action is manageable with respect to the problem of ascertaining and awarding damages once a price-fixing conspiracy has been established. Contrary to defendants' argument, plaintiffs assert that it is possible to determine the amount of damages on a class level and then have individual members of the class make claims for damages; that the damages would either be set at a total figure or at a certain level per gallon purchased; and that once the damage level is established, the mechanics for asserting claims against the total award or per gallon award could be established with a minimum of difficulties. It is also asserted that administration would likewise not be burdensome, and that the problems of managing such a large class would be at a minimum and within acceptable parameters for a Rule 23(b) (3) action. This argument will be examined later when an analysis is made of the problems of management confronting the Court.

## VI. DEFENDANTS' ARGUMENTS AGAINST CLASS MAINTENANCE.

All the defendants named in the three respective complaints with the exception of American Oil Company and Atlantic Richfield submitted memoranda and briefs and argued in opposition to the maintenance of class actions by any plaintiffs[3]. These two defendants have

2. This Court is of the opinion that the notice requirements of Rule 23(c) (2) can be satisfied in all three of the proposed class actions. Defendants' arguments centered upon the difficulties defendants envisioned in giving satisfactory notice to members of the proposed Philadelphia-New Jersey class. Even then those arguments focused upon the largest segment in terms of numbers within the class: motorists who purchased at retail service stations. Because of the disposi-

tion this opinion makes of this latter portion of the Philadelphia-New Jersey class, it would be academic to examine the arguments presented by both sides.

3. Two of the originally named defendants in each of the four consumer actions were The Atlantic Refining Company and Sinclair Refining Company. Subsequent to the filing of the consumer actions but prior to the filing of memoranda and briefs on the class action issues, these

agreed upon a settlement figure with counsel for Philadelphia-New Jersey [4]. They argue, however, that such tentative settlements in no way were intended to bear upon the merits of the class action questions presently before the Court [5].

Defendants make several major arguments to demonstrate why no class action can or should be maintained in these cases. The key to defendants' arguments is their analysis of the complexity of the gasoline market. Thus, to fully understand their arguments, one must be aware of the many different ways in which gasoline is sold to ultimate consumers. Defendants classify gasoline sales into three basic categories:

(1) sales by defendants and other suppliers directly to consumers, distributors or retail dealers;

(2) sales by distributors to retailers and consumers; and

(3) sales by retail dealers to the motoring public.

Defendants and other suppliers sold gasoline at various levels in the chain of distribution and pursuant to different methods of sale. Basically, these methods included: (a) sales to consumers purchasing in bulk; (b) sales to branded distributors for resale to consumers or retail dealers; (c) sales to unbranded distributors for resale to consumers or retail dealers; and (d) sales to retail dealers. Defendants argue that the prices charged in each of the categories listed were different from and independent of one another, and varied from time to time and from sale to sale. Affidavits were submitted to support this assertion.

Sales to consumers purchasing in bulk were made by defendants as follows: (a) by bids; (b) pursuant to negotiated term contracts; or (c) on a spot basis. The prices charged in such sales were generally based upon the seller's posted "consumer tank wagon price", i. e., the posted or scheduled prices utilized as reference points in bulk sales to consumers. Defendants claim that these prices were separate and distinct from the net wholesale prices paid by retail dealers.

Distributors purchased their gasoline from branded or independent suppliers and resold the gasoline. Sales were made not only to branded and unbranded retail service stations but also to purchasers who had bulk storage facilities. Some distributors also owned and operated retail service stations at which they sold gasoline to the motoring public. Each of the distributors established its own resale prices to consumers. According to defendants, these prices were

two corporations agreed to merge. The combined corporation is referred to in this opinion as "Atlantic Richfield".

4. Philadelphia-New Jersey have agreed to settle with American Oil Company and Atlantic Richfield. Pursuant to a motion made by Philadelphia-New Jersey for approval of the settlement agreements and establishment of temporary settlement classes identical to the class they seek to maintain in the litigation, oral argument was heard by this Court immediately after completion of oral argument on the class action issues. American Oil and Atlantic Richfield opposed the motion. Basically, the settling defendants argued that if this Court refused to certify the class Philadelphia-New Jersey seek to represent in their consumer action, the settlement agreements would become null and void. Thus there should be no approval of these agreements until the Court has decided the class action issues. Philadelphia-New Jersey rebutted by distinguishing between settlement classes and litigating classes and interpreted the settlement agreements differently. This Court, after a careful consideration of the arguments presented, adjourned the pending motions without date, choosing to decide the class action issues first.

5. Since oral argument, counsel for Philadelphia-New Jersey and defendant Chevron Oil Company (the successor to the originally named California Oil Company) have brought to the Court's attention the terms of a third settlement between these respective parties. Its terms are somewhat analogous to the terms of the American and Atlantic Richfield settlements.

not totally dependent upon prices charged by their suppliers; distributors' costs differed substantially, as did their markups.

Most gasoline, however, was sold by retail dealers to the motoring public during the relevant time period. Among the large number of retail outlets [6] in the three state area, there were, according to defendants, wide variations in prices charged and pricing policies at any given time. To further complicate the structure of gasoline prices at the retail level, there were at least five separate grades of gasoline which could be sold by retail stations during the relevant period. Defendants say that changes in prices of one grade of gasoline would not necessarily be matched by parallel changes in other grades of the same brand or unbranded gasoline. Defendants, in relating the pricing structure of gasoline, also assert that prices charged by retail dealers in sales to the motoring public bore no fixed relation to the prices the dealers paid for the gasoline. Retailers' markup varied from station to station at any given time. Many dealers also gave their most favored customers "under the canopy discounts", i. e., discounts off the posted retail price. In addition, defendants came to the aid of dealers who were engaged in gasoline price wars by giving them voluntary allowances. This was a discount off the posted dealer tank wagon prices given a dealer to help him compete. Voluntary allowances, according to defendants, were highly localized and responsive to competitive demands.

Utilizing the complex pricing structure of the gasoline market as a foundation, defendants make three basic arguments to contest the maintenance of any class in these consumer cases. Defendants argue that the following requirements of Rule 23 cannot be satisfied by plaintiffs:

(1) that the questions of law or fact common to the members of the class predominate over any questions affecting only individual actions;

(2) that the claims of the representative parties are typical of the claims of the class, and those parties will fairly and adequately protect the interests of the class; and

(3) that the difficulties likely to be encountered in the management of these proposed class actions can be adequately dealt with.

With respect to the predominance requirement, defendants base their argument upon the complexity of the marketing of gasoline and requirements for recovery under Section 4 of the Clayton Act (15 U.S.C. § 15). Defendants argue that no one can recover in these consumer actions unless he demonstrates (a) that the antitrust laws have been violated; (b) that said violations have had an impact upon him; and (c) that as a result he has suffered damages. Under the first of these three criteria, defendants argue that even if the plaintiffs in these consumer actions were to prove each and every allegation made by the United States in the previously mentioned criminal indictment, they would not have proved enough in a civil action for class recovery for the alleged antitrust violations. Defendants point to the different proof requirements between a criminal and civil antitrust action. At the very most plaintiffs will have shown violations in limited geographic areas for limited periods of time. This, defendants believe, leads to a predominance of individual over common issues on the question of whether a conspiracy existed to violate the antitrust laws. It should be noted, however,

---

6. Defendants state in opposition to the maintenance of these actions as class actions, that in 1967 alone there were 18,-399 retail dealers "primarily engaged in selling gasoline" in the three state area.

In addition, there were more than 14,000 other retail outlets such as garages, repair shops, and food stores at which gasoline was sold.

contrary to defendants' view, that at best this argument indicates the tremendous burden on the plaintiffs to prove a conspiracy rather than failure to meet the predominance requirements of Rule 23.

The defendants further argue that even if a price-fixing conspiracy affecting an entire class during the relevant period could be established, the impact of that conspiracy upon gasoline prices would make individual questions predominate over common ones. Defendants believe that the issue of the impact of any conspiracy upon purchases of gasoline is totally separate with respect to each transaction by each claimant. Whether or not the alleged conspiracy had an effect upon the price paid by any one gasoline purchaser would depend upon many factors, including: (a) the nature of the seller; (b) the seller's location; (c) the date of the purchase; and (d) the grade of gasoline purchased. Defendants would have this Court examine each separate transaction made to determine if the price paid by the ultimate consumer contained an illegal overcharge which had been directly passed down from the defendants. This, of course, would create an impossible burden on the Court with respect to class maintenance. Individual issues would clearly predominate over common issues, and thus Rule 23(b) (3) class status would have to be denied. The argument is taken one step further by the defendants. In addition to proving all the factors relevant to impact, each claimant must also prove the elements of his damage claim, i. e., (a) the price he paid for each purchase of gasoline which he claims was affected by the defendants' violation; (b) what the price would have been were there no violation; and (c) the number of gallons which he bought at the time of each affected purchase. Even if the violation and impact issues did present common questions, defendants argue they would be oversha-

dowed by the millions of separate damage issues. And, in an antitrust case such as this, the damage questions could not be separated from the other questions for trial. Thus, say defendants, none of the purported classes meet the predominance requirement of Rule 23(b) (3).

The arguments which defendants make concerning the typical nature of the claims of the representative parties and the protection these parties will give the interests of the members of their respective classes are directed principally against Philadelphia-New Jersey and Yellow Cab. With respect to the purported Philadelphia-New Jersey class, defendants examine the nature of each of said plaintiffs' claims. Defendants note that the City of Philadelphia purchased its gasoline almost exclusively pursuant to bids or negotiations at substantially lower prices than the retail purchasing motorist whom the City of Philadelphia seeks to represent. Defendants argue that it is untenable to designate as typical of a class a representative who purchased gasoline much differently than the vast majority of the people whom he is supposed to represent. New Jersey, according to defendants, is also an atypical representative, insofar as it likewise purports to stand in the shoes of motorists. New Jersey could have purchased all its gasoline at bulk rates but only partially did so. Hence, for the gasoline purchased at retail stations, it paid substantially more than it had to. This, defendants say, makes new Jersey's claims hardly typical of the class it seeks to represent since that class is largely composed of motorists who had no alternative to purchasing at retail dealer prices. The same problems are seen by the defendants in the class represented by Yellow Cab. Since the Yellow Cab plaintiffs purchased in tank wagon quantities, their claims are not typical of the other members of that class who purchased at re-

tail stations. Defendants believe it is irrelevant that all members of the purported class are in the same business.

■ The final major argument presented by the defendants is that the difficulties of management inherent in these consumer class actions are insurmountable. To some extent, this argument relies upon defendants' theory of the case and how it must be tried. Defendants correctly note that if a class action is inherently unmanageable, this alone renders class treatment improper. They then examine the number of members involved in each class. For the Philadelphia-New Jersey class, approximately six to fifteen million potential class members are involved. Coupled with the separate transactions made by each member of the class over the years in question, the resulting figure is so astronomical, say defendants, as to make it obvious that the Philadelphia-New Jersey class is unmanageable.

The same problems befall the McCloskey class according to defendants. Recognizing that a class of 10,000 is not overwhelmingly large under Rule 23(b)(3), defendants combine the number of members with the number of transactions each member made to conclude that it is unmanageable. One must thus accept defendants' theory of handling this case to reach the same conclusion that the McCloskey class is not manageable. Interestingly, defendants argue that because the Yellow Cab plaintiffs account for 23% of all taxicabs in the three state area, no substantial economies can be achieved by class treatment. But in the next breath, defendants argue that because of retail purchases made by some members of the taxicab class, the Yellow Cab class suffers from the same infirmities as the Philadelphia-New Jersey class. Again one must multiply the size of the class by each separate gasoline purchase made by members to conclude that the class is unmanageable.

Finally, in conjunction with their theory of the case, defendants argue that if any or all of the three proposed classes are certified, once notice is provided and the membership of the class defined, defendants will be entitled under the Federal Rules of Civil Procedure to discover from each class member the factual data underlying any claim for damages he may have. This argument, however, assumes that this Court will permit discovery on specific claims prior to a determination of liability and that it is not possible to ascertain damages generally. On both these assumptions this Court is of a contrary view, for reasons to be discussed later in this opinion.

## VII. EVALUATION OF LEGAL ARGUMENTS.

■ Much of defendants' oral argument was devoted to the merits of plaintiffs' claims. Charts and figures were shown which allegedly demonstrated the heterogeneity of gasoline pricing contrary to any pattern which would have resulted if the alleged price-fixing conspiracy had in fact existed. Although these arguments may be of value in planning the scope and length of discovery in preparation for trial, they are not helpful in resolving whether any or all of the three purported classes should be certified. In Kahan v. Rosenstiel, 424 F.2d 161 (3 Cir. 1970) at 169, the Court of Appeals stated: "The determination whether there is a proper class does not depend on the existence of a cause of action. A suit may be a proper class action, conforming to Rule 23, and still be dismissed for failure to state a cause of action." Thus, in this Circuit, there is no requirement of a prima facie showing of merit in a class action to achieve certification. This Court should only examine whether a class has been properly constituted under Rule 23 without reference to the merits of the action. See Knuth v. Erie–Crawford Dairy Co-

operative Association, 395 F.2d 420 (3 Cir. 1968). However, the purported class representatives must have standing to assert personal actions before they can bring a class action. Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727 (3 Cir. 1970). There being no question that each of the plaintiffs involved in these consumer actions has standing to sue by themselves, an examination of whether or not a class or classes have been properly constituted will determine if any or all should be certified.

In deciding the issues presently before this Court, in light of Rule 23(b) (3), it is helpful to note the importance which the Supreme Court has placed on private antitrust litigation. In Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Court reiterated some basic antitrust law before discussing the importance of private litigation. At 489 (392 U.S.) 88 S.Ct. at 2229 the Court expounded traditional doctrine by stating:

> "We think it sound to hold that when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4 [of the Clayton Act]."

In its dictum the Court then touched upon the importance of private antitrust litigation. It did so in the context of avoiding liability by the use of a "pass-on" defense, and stated:

> "In addition, if buyers are subjected to the passing-on defense, those who buy from them would also have to meet the challenge that they passed on the higher price to *Their* customers. These ultimate consumers, in today's case the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court has many times emphasized, would be substantially reduced in effectiveness." Hanover Shoe, supra, at 494, 88 S.Ct. at 2232.

This Court, consequently, must and does note the importance which the Supreme Court has attached to treble damage actions.

Since the major revision of Rule 23, there have been many Rule 23(b) (3) actions in cases alleging antitrust or securities laws violations. These post-1966 cases are all relevant, since the pending consumer actions were filed after the revisions took effect. The first major case to be considered is State of Illinois v. Harper and Row Publishers, Inc., 301 F.Supp. 484 (N.D.Ill.1969). This case involved a treble damage antitrust action seeking compensation for alleged conspiracies which inflated the prices for children's editions of library books. Both horizontal and vertical conspiracies were alleged. In a comprehensive opinion Judge Decker upheld state and nationwide classes. The state class actions were brought by the Attorneys General for several States representing the public libraries, school districts and boards of education in their respective jurisdictions. The nationwide class actions were brought by the School District and the City of Philadelphia representing two nationwide classes composed of approximately the 1324 largest public libraries and school districts in the nation. In arriving at its decision, the court separated the issues of liability and damages, finding that the issue of whether or nor there was a conspiracy to fix prices was common to all class members and predominated over individual questions. Arguments similar to, those that defendants have raised in these consumer actions were rejected. Interestingly, Judge Decker noted the fact that the School District and City of

Philadelphia decided to limit their classes only to their largest members. Originally it would have included all purchasers of children's books in the United States. The court stated at 493:

"The desertion of the smaller purchasers is unfortunate. Therefore, if other plaintiffs had sought to represent all aggrieved purchasers, such an action would presumably have prevailed over the Philadelphia class. But this choice is not presented."

Although this precedent is helpful to the plaintiffs here, it does have one limiting factor. Apparently, the defendants in the children's book case only quoted "net" prices for library editions. Thus, regardless of whether a publisher, a wholesaler or a retail distributor sold the publications, the libraries and schools had no alternative but to pay the same "net" prices. Such price uniformity is not present in the cases before this Court.

In an action brought against two brokerage houses and the New York Stock Exchange on behalf of all purchasers and sellers of "odd-lots" on the New York Stock Exchange, the complaint alleged that between 1960 and 1966, two brokerage firms had combined and conspired to monopolize odd-lot trading and fixed odd-lot differentials in an excessive amount in violation of the Sherman Act. The New York Stock Exchange was also made a defendant and charged with failing to adopt rules protecting odd-lot investors. Judge Tyler determined that this action could not be maintained as a class action. Eisen v. Carlisle and Jacquelin, 41 F.R.D. 147 (S.D.N.Y.1966). That determination was held to be appealable. Eisen v. Carlisle and Jacquelin, 370 F.2d 119 (2 Cir. 1966), cert. den. 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967). The Court of Appeals reversed the determination made on the class issue, found the issue of conspiracy common and predominating, and stated that all the individual questions presented by the de-

fendants really concerned the issue of computation of damages. The action was remanded, and the remand permitted the District Court to make further investigation into the manageability of the class and possibly dismiss the class suit because of problems which might arise in giving notice or computing damages. Eisen v. Carlisle and Jacquelin, 391 F.2d 555 (2 Cir. 1968).

Judge Tyler, in light of the mandate, reviewed his initial determination and made new findings which sustained the class action. Eisen v. Carlisle and Jacquelin, 52 F.R.D. 253 (S.D.N.Y.1971), opinion filed April 7, 1971. Specific findings were made with respect to the number of individuals, institutions and intermediaries who participated in odd-lot transactions during the relevant periods. The court also found that during the period from May 1962 through June 1966, the typical buyer or seller of odd-lots in stocks listed on the New York Stock Exchange had approximately 5 such transactions. The average odd-lot transaction during such period was approximately 28.2 shares at $50.84 per share. The average odd-lot differential per transaction during such period was approximately $5.18. Similar findings were made for the period from May 1962 through June 1968. Records existed which could give the court the names and addresses of at least one-third of the class membership (approximately 2,000,000 identifiable class members). The balance could not be identified with reasonable effort. The various requirements of a Rule 23(b) (3) action were examined in depth. On the issue of manageability, the court concluded:

"In this case, I am satisfied that gross damages may be fairly estimated without having individual claims filed by each class member. The sources for such a computation will include at least the following: defendants' own records, the Report of Special Study of Securities Markets of the Securities and Exchange Commission, H. R. Doc. No. 95, Part 2, 88th

Cong., 1st Sess. (1963) * * *, records of the NYSE [New York Stock Exchange] Special Committee on Odd Lots relating to the lowering of the odd-lot differential in 1966 and a cost study of the odd-lot industry conducted for the NYSE by Price Waterhouse & Co." (Citations omitted) Eisen v. Carlisle and Jacquelin, 52 F. R.D. 253 at 262 (S.D.N.Y.1971), filed April 7, 1971.

Judge Tyler then went on to discuss problems of notice. He resolved the questions in favor of class maintenance. However, the question of who should bear the cost of notice was left unresolved. This is not a problem in the actions presently before this Court.

With respect to the sheer size of the class involved, the Eisen decision is quite helpful. The parameters of a Rule 23(b) (3) action are indeed expansive when a class can be certified which involves approximately 6,000,000 individuals, institutions and intermediaries who participated in many odd-lot transactions during the relevant periods. However, several important distinctions must be drawn between the Eisen action and the consumer cases before this Court. The court in Eisen was able to make specific findings with respect to the average odd-lot transaction and average odd-lot differential per transaction. No such figures could be established in these consumer actions. Gasoline was purchased in many different ways, at different prices and in varying quantities and qualities. The best plaintiffs can show with respect to gasoline purchases is the amount purchased, the quality purchased and the price paid for that purchase. No average transaction can be established, given the nature of the gasoline market. In addition, the court in Eisen had at its disposal several detailed and specific documents which would be of value in assisting the court in awarding damages if liability were found. No such documentation appears to exist in these consumer actions.

The antibiotic antitrust cases demonstrate the extent of development in Rule 23(b) (3) actions in both litigation and settlement contexts. These cases involve approximately 150 civil actions, some of which were commenced in the Southern District of New York and others which were transferred to that District by the Judicial Panel on Multidistrict Litigation for coordinated or consolidated pretrial proceedings. The allegations in each of the actions are that the defendants, who manufacture certain broad spectrum antibiotic drugs, are guilty of violations of the antitrust law. Treble damages are sought. A settlement agreement was reached between many of the plaintiffs and all the defendants in these antibiotic cases. Judge Wyatt, who was originally assigned to coordinate or consolidate pretrial proceedings, accepted the proposed settlement. West Virginia v. Charles Pfizer and Company, Inc., 314 F.Supp. 710 (S.D.N.Y.1970). A nationwide class was temporarily established for the purposes of distribution of a $100,000,000.00 settlement fund. Certain plaintiffs exercised their option under Rule 23 to exclude themselves from the proposed settlement and hence kept the litigation alive. Although the administration of a settlement fund is not precedent for establishing the manageability of a class in a litigation context, the problems the court faced in approving the settlement are indicative of the ability of any court to handle the vast problems of managing very large classes. The District Court's approval of the antibiotic settlement was affirmed in West Virginia v. Charles Pfizer and Company, Inc., 440 F.2d 1079 (2 Cir. 1971).

The actions which were not settled were transferred to Judge Miles Lord to coordinate pretrial proceedings. In these remaining actions, the court was presented with questions similar to those which now face this Court. Judge Lord certified two classes for litigation, one consisting of the government enti-

ties within the given states still litigating, In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions (Government Entity Class Actions), F. Supp. (S.D.N.Y.1971), opinion filed February 17, 1971, and the other consisting of the ultimate consumers within those litigating states, In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions (Consumer Class Actions), F. Supp. (S.D.N.Y.1971), opinion filed February 17, 1971. This latter class is analogous to the proposed Philadelphia-New Jersey class. In reaching his decision for certification in the consumer class actions, Judge Lord held that the question of conspiracy predominated over questions of individual damage. He also believed that total damages could be ascertained if liability was first established, and then individual claims could be made against the fund. With respect to potential manageability problems, Judge Lord said:

> "The court would be hesitant to conclude that conspiring defendants may freely engage in predatory price practices to the detriment of millions of individual consumers and then claim the freedom to keep their ill-gotten gains which, once lodged in the corporate coffers, are said to become a 'pot of gold' inaccessible to the mulcted consumers because they are many and their individual claims small." In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions (Consumer Class Actions), supra, at 10 of the opinion filed February 17, 1971.

However, the court did not permit the mailing of notices to the members of the consumer class until plaintiffs sufficiently demonstrated that the actions were manageable and that satisfactory notice to the class was possible.

In a subsequent opinion the court did find that the actions were manageable and that notice could be directed to the class members in such a manner as to make the class action superior to other available methods for the resolution of the controversy. It was specifically held that a general level of damages could be ascertained with reference only to sales figures; and further, that should liability be established, each class member would receive a relatively large recovery with minimal cost. In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions (Consumer Class Actions, Opinion No. 2), 333 F.Supp. 278, 285 (S.D.N.Y.1971), opinion filed May 4, 1971.

These decisions in the litigated antibiotic antitrust actions are significant. They would appear to resolve the issues raised for class certification in favor of the litigating plaintiffs. But underlying these decisions is a belief that a total damage award could be established for the entire class. Such a total damage figure against which damages may be claimed by individuals would be much more difficult to achieve in the consumer actions pending in this Court. Even if such a figure could be ascertained, significant problems would remain. Unlike the antibiotic price structure, the gasoline price structure was much less stable and more complex because of the various methods of sale, thus creating problems for awarding individual damages. In the consumer actions here, there has been no showing that individual class members would receive a relatively large recovery with minimal cost if liability is established as the court found in the litigated antibiotic antitrust cases. There further exists the possibility that many class members who rightfully are entitled to recover would be unable to do so in these consumer actions because of a lack of records. The court passed over this latter problem in the litigated antibiotic antitrust cases by stating that the disposition of unclaimed funds after liability and damages have been proven " * * * is a question to be answered at a later time, if at all." In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions (Consumer Class Actions, Opinion No. 2), su-

pra, at 7 of the opinion filed May 4, 1971. Thus, the court left this question open.

In the Eastern District of Pennsylvania, two Rule 23(b) (3) classes were certified in antitrust litigation involving the drug quinidine. In Cusick v. N. V. Nederlandsche Combinatie Voor Chemische Industrie, 317 F.Supp. 1022 (E.D. Pa.1970), the court upheld a class consisting of all users of quinidine for heart ailments, comprising about a quarter of a million people throughout the United States. However, the class was certified on condition that plaintiffs at a later time demonstrate (1) that notice could be given to the members of their class in a manner which complies with Rule 23; (2) that plaintiffs are prepared to finance the notice; and (3) that the class is manageable. The relevance of this decision is, of course, limited by the conditions placed upon final class certification. In the companion case, Sol S. Turnoff Drug Distributors, Inc. v. N. V. Nederlandsche Combinatie Voor Chemische Industrie, 51 F.R.D. 227 (E.D.Pa.1970), a class was upheld for all wholesale and retail outlets in the United States purchasing quinidine products for resale.

A review of six other cases is helpful in indicating how courts have interpreted the requirements for a Rule 23(b) (3) class action. Although these cases may not involve classes as expansive as some of those previously mentioned, they do demonstrate the trend which has been established. The first of these cases is Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E. D.Pa.1968). These were ten related antitrust treble damage actions against sellers of brass mill tube and pipe products, five of which were class actions. Judge Fullam held that the actions were maintainable as class actions on behalf of all governmental entities within the Eastern District of Pennsylvania; all state governments; all governmental entities having state-wide jurisdiction; all

cities in the nation having a population as of the 1960 census in excess of 50,-000; and all school districts and public building authorities within those cities. With respect to the proposed action on behalf of approximately 18,000 builders of home and apartment dwellings throughout the United States, the court limited the class to builders whose operations occurred within the Eastern District, providing that the problems of identification and notice could be reasonably solved.

Siegel v. Chicken Delight, Inc., 271 F. Supp. 722 (N.D.Calif.1967) was also a treble damage antitrust action brought by five of approximately 650 franchisees alleging a price-fixing conspiracy among other things. The court sustained the class, finding the questions of conspiracy common and predominating over questions of damages. In State of Iowa v. Union Asphalt and Roadoils, Inc., 281 F.Supp. 391 (S.D.Iowa 1968), the State of Iowa brought a civil antitrust action for treble damages on behalf of itself and all political subdivisions of Iowa against distributors and sellers of liquid asphalt and allied material. The class was upheld despite protests that the claims of the State were not typical. The court stated, in answer to this contention, that if different factual patterns arose as the case progressed, it could remedy the situation by creating subclasses.

In a very complicated case, nine broad class actions were upheld in a suit involving different types of injury caused by air pollution. In re Multidistrict Private Civil Treble Damage Antitrust Litigation Involving Motor Vehicle Air Pollution Control Equipment, 52 F.R.D. 398 (C.D.Cal.1970). Similar class certification was achieved in the Southern District of New York involving alleged violations of securities laws. The first, Mersay v. First Republic Corporation of America, 43 F.R.D. 465 (S.D.N.Y.1968), was a securities fraud case brought by the plaintiff on behalf of himself and

others similarly situated to recover damages allegedly suffered in connection with purchases and exchanges of stock of defendant corporation. The court found that common questions of law or fact relating to defendant's general liability predominated over individual questions which would determine each individual's right to recovery. The second, Berland v. Mack, 48 F.R.D. 121 (S.D.N.Y.1969), was also a securities fraud case which the consolidated plaintiffs wished to maintain as a class action. The court upheld the class, finding that common issues predominated even though 4,458,400 corporate shares were traded on the American Stock Exchange during the relevant period, and further found that a class action was a proper vehicle since it would provide relief for numerous class members whose claims were too small to bring individual actions.

■ From these cases and other relevant precedent this Court can draw certain conclusions with respect to how the requirements for class certification under Rule 23 should be interpreted. The issues of liability can be separated from questions of individual damage when deciding if common issues of fact and law predominate over individual questions. Eisen v. Carlisle and Jacquelin, 52 F.R.D. 253 (S.D.N.Y.1971); State of Illinois v. Harper and Row Publishers, Inc., 301 F.Supp. 484 (N.D.Ill.1969); Mersay v. First Republic Corporation of America, 43 F.R.D. 465 (S.D.N.Y.1968); Berland v. Mack, 48 F.R.D. 121 (S.D.N.Y.1969). In price-fixing antitrust cases the issues of impact of the conspiracy and damages become one and the same since the amount of damages measures the impact of the illegal conspiracy. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 489, 88 S.Ct. 2224, 20 L. Ed.2d 1231 (1968); In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions (Consumer Class Actions), 333 F.Supp. 278 (S.D.N.Y.1971); Eisen

v. Carlisle and Jacquelin, 52 F.R.D. 253 (S.D.N.Y.1971).

■■ With respect to the questions of size and who can serve as class representatives, it is proper to recognize as a class all government units within a larger governmental body and have that class represented by one or more governmental units within the class. In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions (Government Entity Class Actions), 333 F.Supp. 267 (S.D.N.Y.1971); State of Illinois v. Harper and Row Publishers, Inc., 301 F.Supp. 484 (N.D.Ill.1969); State of Iowa v. Union Asphalt and Roadoils, Inc., 281 F.Supp. 391 (S.D.Iowa 1968); Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E.D. Pa.1968); In re Multidistrict Private Civil Treble Damage Antitrust Litigation Involving Motor Vehicle Air Pollution Control Equipment, 52 F.R.D. 398 (C.D.Cal.1970). Furthermore, the state attorney general, or his duly authorized agent, can represent all the consumers within his given state in a Rule 23(b)(3) action. In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions (Consumer Class Actions), 333 F.Supp. 278 (S.D.N.Y.1971).

■■ This Court is of the opinion that in each of the consumer actions pending here, common questions of law and fact predominate over individual questions. As seen from the cited cases, the predominance requirement is met if there is one underlying conspiracy alleged to have affected all members of the class, and damages are ascertainable on a general level. Defendants' argument concerning the individual questions raised by the alleged conspiracy centers not on the issue of whether or not such a conspiracy existed but rather upon what effect that conspiracy, if it existed, had upon the ultimate users of gasoline. The proof of whether or not a conspiracy existed will be the same for all plaintiffs. With respect to the question

of damages, this Court believes that the difficult individual questions raised can be separated from common questions and that, if liability is established, plaintiffs can proceed to treat damages in general economic terms. This Court is well aware of the complexity of gasoline pricing as compared to that of odd-lot securities transactions and other cases where classes have been maintained under Rule 23(b) (3), and is also aware of the lack of prepared economic data which would simplify the task of ascertaining damages. However, defendants should not be permitted to profit, if in fact they did violate the antitrust laws, because of the complexity of the pricing structure of gasoline. Plaintiffs should be given the opportunity to prove for themselves and the members of their classes that the alleged conspiracy did in fact exist and that the price structure of gasoline was artificially kept above competitive levels. This Court does not perceive a substantial difference in what plaintiffs have to prove on each of these two key issues if they sue only on their own behalf or as representatives of a given class.

█ Notwithstanding the foregoing observations, certain arguments presented by defendants must still be answered before any class can be certified. With respect to defendants' argument concerning the typical nature of the claims of the representative parties, this Court is of the opinion that all the major plaintiffs present typical claims and can fairly and adequately protect the interests of the members of their respective classes. Because certain plaintiffs purchased in large quantities at substantially lower prices than others does not make their claims atypical. What is alleged here is an overall conspiracy affecting all prices. Thus, the proof needed to demonstrate this will be the same irrespective of whether one purchased in five hundred gallon quantities or from retail service stations. This Court is satisfied with the competence of all counsel representing plaintiffs and is also satisfied that they will press forward their claims in a vigorous manner to the advantage of all the members of their respective classes. All purported classes, hence, meet the requirements of Rule 23(a).

Rule 23(b) (3), the specific subsection under which all three purported classes are allegedly maintainable, requires not only predominance of common over individual issues but also that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. Defendants have argued that this requirement has not been met because the actions are unmanageable. On this point, the allegations made in Hawaii v. Standard Oil Company of California, Civil No. 2826 (D.Hawaii, oral opinion May 29, 1969), are very similar to those made in these consumer actions. Like the Philadelphia-New Jersey action, Hawaii brought a treble damage action against major oil companies alleging a price-fixing conspiracy within the State of Hawaii. Suing in many different capacities and under different theories, Hawaii also included a count alleging a class action under Rule 23(b) (3) for all ultimate consumers of gasoline within the State. Judge Martin Pence denied class certification [7]. In denying class certification of the all-encompassing

---

7. The court, at the same time, upheld a count of the complaint in which the State of Hawaii sued in its *parens patriae* capacity for the people of Hawaii. After rendering his oral opinion, Judge Pence inquired whether either party wished certification for appeal pursuant to 28 U.S.C. § 1292(b). Defendants requested, and were granted, certification on the *parens patriae* issue. The State of Hawaii accepted the court's adverse ruling on class certification and did not request leave to appeal that determination.

class proposed by the State of Hawaii, Judge Pence stated:

"Now, we know that when it [Hawaii] buys at retail, say, over on the Island of Molokai—somebody found it easier to go to a service station and spend the State's money to buy gasoline—now, if they say that because that took place that we are now ready to take on and give the Court the horrendous problem of every last one of the individuals throughout the State, or whoever were here during that period, who purchased gasoline at retail, and take on the burden of determining how much each and every one should ultimately be entitled to who finally came in under the class, I state that I see so many, many problems—those who have been here and gone; those who bought 5¢ or $50 or $39.70, whatever it might be over a period. Even if you were able to say that, well, everyone of them had a credit card, which is not true, we know, so all we'd have to do is grab the records of these various companies, and just take all the credit card listings, and so forth, gentlemen, even if it were that way, I would hold that, under the circumstances right now, the class action based upon the injury to every individual purchaser of gasoline in the State, to me at the present time, in the context of the pleadings, would be unmanageable." Hawaii v. Standard Oil Company of California, Civil No. 2826, oral opinion, May 29, 1969, at 154–155.

Two other cases dealing with eggs and bread, respectively, bear upon the question of manageability. United Egg Producers v. Bauer International Corporation, 312 F.Supp. 319 (S.D.N.Y.1970), considered a motion for partial summary judgment dismissing two counterclaims which alleged violations of the Sherman Act. The defendant sought in the second counterclaim to maintain an action on behalf of himself as a consumer of eggs and all consumers of eggs in the United States similarly situated. The Court in dismissing both counterclaims, noted with respect to the second:

"* * * we think it obvious that a class comprising all consumers of eggs in the United States is so large that it is unmistakably beyond the limit of a permissible class action. It would be next to impossible to identify members of the class and to give them appropriate notice. The management problems for the court would be virtually insuperable." United Egg Producers v. Bauer International Corporation, supra, at 321.

However, the significance of this holding is limited by the further finding that the defendant was a sole owner of one of the leading import-export companies in agricultural and poultry products. His economic interest lay not with the consumers but rather with suppliers.

In the bread case, Hackett v. General Host Corporation, Civil No. 70–364 (E.D.Pa.), memorandum opinion of July 30, 1970, plaintiff, a consumer of bread who purchased from a retail outlet, sought to have named as a class all individual consumers situate in the Philadelphia market, who had purchased at retail, for their own use or for members of their household, pan baked bread. Plaintiff asserted that there were six million consumers in the geographical area and that approximately 1.5 million people purchased from retail stores. The court denied class certification, and concluded:

"It is our considered opinion that under the facts of this case, the problem of management of the proposed class is clearly insurmountable. The class is so large that it would be unmanageable and could only result in many knotty, complicated and unnecessary problems." Hackett v. General Host Corporation, supra, at 7 of memorandum opinion.

An appeal from this determination is pending.

To adequately evaluate the problems this Court believes will be encountered

in managing these consumer actions as compared to the management problems faced in Hawaii, United Egg and Hackett, each purported class will be examined separately. The class which the Yellow Cab plaintiffs seek to maintain does not pose any management difficulties which would make individual actions superior to a class action. The size of the class, approximately 550, is not so great per se as to make it unmanageable. It is relatively small compared to the sizes of classes which have been upheld on a nationwide or smaller geographic basis. Eisen v. Carlisle and Jacquelin, 52 F.R.D. 253 (S.D.N.Y. 1971); Cusick v. N. V. Nederlandsche Combinatie Voor Chemische Industrie, 317 F.Supp. 1022 (E.D.Pa.1970); In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions (Consumer Class Actions), 333 F.Supp. 278 (S.D. N.Y.1971). Public records exist which make it relatively easy to ascertain the membership of the class. The cost of mailing individual notice to all class members is not prohibitive. Although there may be some difficulty in ascertaining individual damages because of the varied methods by which class members purchased gasoline this is offset by the fact that taxicab owners and operators, as businesses, should have accurate records of gasoline purchases.

McCloskey's proposed class also satisfies the requirement of manageability. The size of the class, approximately 10,000, is again not so large as to make the class inherently unmanageable. It is much smaller in numbers than other classes which have been upheld. Eisen v. Carlisle and Jacquelin, 52 F.R.D. 253 (S.D.N.Y.1971); Cusick v. N. V. Nederlandsche Combinatie Voor Chemische Industrie, 317 F.Supp. 1022 (E.D. Pa.1970); State of Illinois v. Harper and Row Publishers, Inc., 301 F.Supp. 484 (N.D.Ill.1969); Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E.D.Pa.1968). The cost of mailing individual notice to class

members will not be prohibitively expensive. However, there will be difficulties in determining who is a member of the class. At the present time there does not exist a comprehensive list of those who purchased in tank wagon quantities during the relevant period. McCloskey does note, however, that several defendants have extensive lists of such purchasers. If given access to such lists, McCloskey believes it can compile a comprehensive list of class members. It should be given this opportunity. Furthermore, this Court believes that the problems of ascertaining individual damages will not be overwhelming, because the members of this class, as business entities, presumably kept accurate records of their purchases. These records should reflect not only the quantity of gasoline purchased but also the grade and price paid for the gasoline purchased.

■ Finally, this Court must consider the management problems involved in the Philadelphia-New Jersey class. Since this class is all-encompassing and would include both the Yellow Cab and McCloskey classes, it would be best to analyze the Philadelphia-New Jersey class in its component parts. The class will be divided into governmental and non-governmental users. The non-governmental users will be further refined to tank wagon and non tank wagon purchasers. It is clear that a class consisting of all governmental units within a state is a proper class if the class is manageable. State of Iowa v. Union Asphalt and Roadoils, Inc., 281 F.Supp. 391 (S.D.Iowa 1968); Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E.D.Pa.1968); State of Illinois v. Harper and Row Publishers, Inc., 301 F.Supp. 484 (N.D.Ill.1969); In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions (Government Entity Class Actions), 333 F.Supp. 267 (S.D.N.Y.1971). The only difficulties in managing this portion of the Philadelphia-New Jersey class will

involve ascertaining individual damages. Government units within the states of Delaware, New Jersey and Pennsylvania purchased gasoline in a variety of ways. Some units purchased from retail dealers while others purchased in cargo quantities (5 million gallons). Being public bodies, however, these units kept accurate records of the quantity and quality of gasoline purchased and prices paid. These records should eliminate many of the problems involved in ascertaining individual damages. Since this Court believes that the residual problems involved in ascertaining damages do not make this portion of the Philadelphia-New Jersey class unmanageable and since the Court can foresee no great difficulties in compiling a list of all government units and mailing individual notices at a reasonable cost, governmental units within the states of Delaware, New Jersey and Pennsylvania as a class meet the requirements of manageability.

The non-governmental members of the Philadelphia-New Jersey class can, as previously stated, be divided into final users who purchased in tank wagon quantities and final users who did not. The former is the class McCloskey seeks to represent. Hence it meets the requirements of manageability as outlined before. The latter group is the bulk of the Philadelphia-New Jersey class. It is composed of motorists who purchased gasoline from retail dealers at pump prices or perhaps at pump prices minus and under the canopy discount. Conservatively, plaintiffs and defendants place the number of people involved at six million. This six million represents only numbers of people and not numbers of transactions. If one were to consider the number of purchases each of these motorists made over the applicable time period, the resulting figure would be astronomical.

It would be almost impossible or at the very minimum prohibitively expensive to compile a list of the members of this class. Although notice requirements could be satisfied by way of newspaper publication and other available methods of communication, individual notice could not be given. Although this Court could order that all discovery on damages with respect to this particular group not be commenced until after liability and general damages are established, the problems inherent in administering damage claims, if liability and a general level of damages are established, are staggering. It must be kept in mind that the Court is dealing with a class action in litigation. Precedent involving settlements are of little value when envisaging the problems involved in a litigation context. See generally, West Virginia v. Charles Pfizer and Company, Inc., 314 F.Supp. 710 (S.D.N.Y. 1970), aff'd West Virginia v. Charles Pfizer and Company, Inc., 440 F.2d 1079 (2 Cir. 1971). Counsel for Philadelphia-New Jersey argue that once liability and a general level of damages are established, the mechanics of distribution of treble damage awards would involve a minimum of Court effort. Notice of the award would be published with instructions on how to file claims. Claim forms would be provided to persons desiring to recover some of the treble damage award. This form would be sent to a committee of counsel who would then determine if the claim should be allowed or not. Challenges of the committee's decision would, of course, be sent to the Court for resolution.

Although Judge Tyler, in Eisen v. Carlisle and Jacquelin, 52 F.R.D. 253 (S.D.N.Y.1971), did certify a class similar in size to the subclass under consideration, the factual situation in that case was quite different from that involved in these consumer actions. The court was able to determine average figures for all transactions that occurred, and in addition, had a situation in which the defendants charged the same odd-lot differential to all buyers and sellers. Even then it should be noted, the court was reluctant to certify the class in view

of the problems involved in administering a fund against which literally millions of claims would be made. As a consequence Judge Tyler discussed the possibilities of a "fluid class recovery" as a resolution to this difficult problem. He stated:

"With these indicia present, I think it appropriate, as plaintiff urges, to consider some kind of 'fluid class recovery', i.e. to consider distribution of damages to the class as a whole rather than to adopt, at this initial, planning stage, an inflexible mold of recovery running to specific class members. To emphasize individual recovery is to unduly stress considerations not totally relevant to the conditions of this case, especially the small amounts of potential recoveries by most class members, which, absent the class device, would effectively bar suit by the majority of odd-lot investors. Perhaps fortuitously, the repetitive activity of the principals in odd-lot transactions makes it possible to fashion a procedure which will assure that the benefits of any recovery will flow in the main to those who bore the burden of defendants' allegedly illegal acts. Indeed, there is respectable precedent for such a 'fluid class recovery'. See Bebchick v. Public Utilities Commission, 115 U.S.App.D.C. 216, 318 F.2d 187 (1963), cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963); the *Drug Cases, supra*; Daar v. Yellow Cab Company, *supra*. This does not mean, of course, that individual recovery is to be entirely ruled out. Individual claims may be satisfied to the extent they are filed, but the fluid class recovery might then be appropriate for distribution of the unclaimed remainder." Eisen v. Carlisle and Jacquelin, *supra*, at 264.

Such a solution to the problems of awarding damages to individual claimants is not realistically available for the group here under consideration. The motorist who purchased gasoline from a retail station during the relevant period is still likely, if he has not moved out of the trading area, to continue his purchases of gasoline. However, he will be joined by many persons who were either not old enough to have had a driver's license or were not residing in the trading area between 1955 and 1965. Any fluid class recovery would be a windfall to them and a deprivation to the motorist entitled to recovery. This Court, believing that the composition of the motoring public which purchased from retail stations has changed considerably during and since the alleged conspiracy ended, concludes that there can not be a fluid class recovery for this group of the Philadelphia-New Jersey class. Hence, the Court must consider the problems it will face when individual motorists begin filing damage claims.

This Court is not at all persuaded, as suggested by counsel for the Philadelphia-New Jersey class, that the many difficult problems involved in managing such a large size class are of easy solution. It is readily apparent that no matter how easy it is to establish damages on a class level, if it is extremely difficult or almost impossible to distribute these sums to their rightful recipients, the class is unmanageable In discussing the motorist who purchased gasoline from retail stations between 1955 and 1965, the Court is speaking by and large of a class that made cash purchases at many different stations, at many different times, at many different prices. Credit card statements would be helpful, but they are not available from either plaintiffs or defendants during most of the relevant period. The proposed committee of counsel, who are supposed to evaluate the claims of each motorist against the damage award, would be given an almost impossible task to resolve. Even if this committee could ultimately relate damage awards to the amount of miles one drove within the trading area between 1955 and 1965, the committee would still need some

records upon which to base an award. Affidavits would not be sufficient by themselves. The only common document which could satisfy the barest essentials of due process in awarding damages to individuals would be income tax returns for the relevant years. However, use of this type of record could only result in unjustifiably prejudicing the rights of people who did not itemize deductions. Simply stated, this Court is not satisfied that the motorist who purchased from a retail service station between 1955 and 1965 within the states of Delaware, New Jersey and Pennsylvania has available to him the type of records necessary to make any meaningful distribution of damage awards if liability and general damages are established. As a consequence, the Court concludes that this portion of the Philadelphia-New Jersey class is unmanageable, and hence, should not be certified.

The argument that defendants should not be permitted to profit by the enormity as well as the magnitude of their conspiracy has been carefully considered. Assuming that there was a price-fixing conspiracy which affected all ultimate users of gasoline, this Court is well aware of the consequences of not certifying as a class the motorists who purchased from retail stations. These particular individuals purchased more gasoline than all other ultimate users put together. Not being able to sue as a class, their interests in maintaining an antitrust action are so minimal that no action will probably ever be commenced. Hence, the bulk of the ill-gotten gains reaped by defendants through their assumed conspiracy will remain untouched within their corporate coffers. Although this Court recognizes the importance of private antitrust actions to help enforce the antitrust laws, Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), it is not believed that Rule 23 was intended to permit a redress for all wrongs committed under the antitrust laws. This Court is cognizant of the complexities involved in suing on behalf of such large groups of people and entities as well as the laudable purpose sought to be achieved by class representation. However, the basic requirements of Rule 23 must be established before there can be class certification. It is unfortunate that many potential recipients of treble damage awards may not be able to recover because the Court has found their purported class to be unmanageable.

In arriving at the conclusions herein expressed, this Court has given careful consideration to the innovative suggestions advanced by Judge Lord in his excellent opinion in In re Coordinated Pretrial Proceedings In Antibiotic Antitrust Actions (Consumer Class Actions), 333 F.Supp. 278 (S.D. N.Y.1971). The Court is also cognizant of the action taken by the Court of Appeals for the Second Circuit in denying the applications for writs of mandamus filed by the defendants in the antibiotic and odd-lots securities cases, and that there is a possibility that there may be a rehearing in the antibiotic case. Despite the commendable ends sought to be achieved by these and other cases to reach millions of ultimate consumers of a variety of products by the technique of class representation, this Court believes that the line must be drawn somewhere in those cases involving untold numbers of members of the general public. The manageability requirement of Rule 23 is a significant factor that must be given due weight in reaching a determination on the propriety of class representation in any given case. It is recognized, of course, that each case must turn on its own facts. Numbers alone would not necessarily be determinative as to whether a particular class should be certified. Methods of marketing, price structures, availability of records, economic data, and other considerations enter into the picture. In the cases pending in this

Court, members of the public who purchased gasoline from retail outlets between 1955 and 1965 in the three state area are legion in number. The individual purchases made by them would run into astronomical figures. It is hardly to be expected that such individual members of the motoring public would have records or other supporting indicia of their many purchases. By any reasonable standard, it is difficult for this Court to believe that Rule 23, as presently written, was intended to reach the overly broad non-governmental class sought to be represented by Philadelphia-New Jersey in the pending actions. This is not to say that guilty conspirators should not be compelled to disgorge their ill-gotten gains. The solution of the problem, however, lies not in imposing an increased burden on the federal courts over and above that which may or should normally be expected of judges in the discharge of their judicial duties, but rather in having the antitrust laws or rules amended to alleviate the problem of manageability inherent in class actions wherein millions of members of the consuming public are involved.

## VIII. CONCLUSION.

For the foregoing reasons, this Court concludes with respect to the three proposed classes in these consumer actions:

(1) the membership in each class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common within each class;

(3) the claims or defenses of the representative parties of each class are typical of the claims or defenses of the members of that respective class;

(4) the representative parties of each class will fairly and adequately protect the interests of that respective class; and

(5) that the questions of law or fact common to the members of each class predominate over any questions affecting only individual members of each respective class.

This Court further finds that with respect to the Yellow Cab and McCloskey purported classes, a class action is superior to other available methods for the fair and efficient adjudication of the controversy. In reaching this conclusion, this Court has considered, among other factors, specifically: (A) the interest of members of each respective class in individually controlling the prosecution or defense of separate actions in each of the two consumer cases under consideration; (B) the extent and nature of any litigation concerning the controversies already commenced by or against members of each respective class; (C) the desirability or undesirability of concentrating the litigation of these claims in this particular forum; and (D) the difficulties likely to be encountered in the management of these class actions.

The same considerations have been taken into account in arriving at a decision on the question of certification of the proposed class in the consolidated Philadelphia-New Jersey consumer action. This Court is of the opinion that the following portion of the Philadelphia-New Jersey class presents a class action that is superior to other available methods for the fair and efficient adjudication of the controversy: all state and municipal governments, governmental agencies, authorities, commissions and subdivisions situated throughout the states of Pennsylvania, New Jersey and Delaware which have purchased, directly or indirectly, for use and not for resale, the products described in the suit from one or more of the defendants in the period in suit and have sustained damages thereby as a result of the conspiracy alleged in the suit.

With respect to the non-governmental portion of the proposed Philadelphia-New Jersey class, this Court further finds that the portion of non-governmental users which can be described as

motorists who purchased gasoline from retail dealers or purchased in less than tank wagon quantities is not a proper class and that a class action as to this portion would not be superior to other available methods for the fair and efficient adjudication of the controversy. Specifically, this class would be unmanageable. In conclusion this Court certifies that both the Yellow Cab and McCloskey plaintiffs are proper classes. The Philadelphia-New Jersey class is also certified, but only to the extent of governmental purchasers as previously indicated.

Counsel for plaintiffs, on notice to counsel for defendants, will please submit appropriate orders. The matter of giving appropriate notice to the classes herein certified will be held in abeyance pending a possible appeal from the orders to be entered in conformity with this opinion and after hearing the argument of counsel on this issue.

